# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# WICHITA FALLS DIVISION

| | |
|---|---|
| RUSTY G. COOK, § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. 7:07-CV-0170-BF |
| § | |
| MICHAEL J. ASTRUE, § | |
| COMMISSIONER OF THE SOCIAL § | |
| SECURITY ADMINISTRATION, § | |
| § | |
| Defendant. § | |

## MEMORANDUM OPINION AND ORDER

This is a consent case before the United States Magistrate Judge. Rusty Glen Cook ("Plaintiff") appeals the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claims for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI") payments under Title XVI of the Social Security Act. Cook commenced his appeal on November 20, 2007. The Commissioner filed an answer on June 25, 2008. The Court has considered Plaintiff's brief, the Commissioner's response, and has reviewed the record in connection with the pleadings. The final decision of the Commissioner is **AFFIRMED**.

## BACKGROUND

### Procedural History

Cook protectively filed applications for DIB and SSI on June 6, 2005. (Tr. 14). He alleged that he became unable to work on January 1, 2000, due to bipolar disorder. (Tr. 61-62, 81-82, 199-120.) After both applications were denied initially and on reconsideration, Cook properly filed for a hearing before an Administrative Law Judge ("ALJ"). ALJ Lance K. Hiltbrand held a hearing on

March 8, 2007. The following witnesses appeared and testified at the hearing on March 8, 2007: Plaintiff and a vocational expert ("VE"), Jennifer Sullivan. (Tr. 200-37.) A non-attorney representative assisted Cook at the hearing. (Tr. 35, 38, 200-237.) The ALJ issued an adverse decision on March 8, 2007. Cook requested review by the Appeals Council, and it was denied on September 21, 2007. (Tr. 11-22.) The ALJ's decision thus became the Commissioner's final decision.

## Cook's Age, Education, and Work Experience

Cook was born on September 1, 1979. (Tr. 126). At the time of the decision, Cook was twenty-seven years old. (Tr. 205.) Cook is a high school graduate and has past relevant work experience as a cook, care giver, stock clerk, dietary aide, landscape laborer, and fast-food worker. (Tr. 88, 205, 223, 232-33.)

## Cook's Medical Evidence[1]

Cook attended twenty-four hours of court-ordered anger management training with Fred Fox for "verbal-anger control issues" in September 2001, after he was arrested for spousal abuse. (Tr. 138.) He exhibited attention deficit disorder ("ADD") symptoms on the Amen Questionnaire and the Bender-Gestalt Test. (Tr. 138-39.) He completed the anger-management therapy as part of his probation. (Tr. 137.) Cook underwent psychiatric evaluation at Helen Farabee MHMR Center ("MHMR" or "Helen Farabee") from June 4, 2002 until November 2002. (Tr. 190.) He was diagnosed with intermittent explosive disorder and adjustment disorder with depression. (*Id.*) He responded to a prescription for Depakote 250 mg. However, he was discharged for non-compliance

---

[1] Cook did not allege that any physical impairments interfered with his ability to work. (Tr. 217.) Accordingly, the Court only summarizes the medical evidence related to his mental impairments.

2

with treatment. (*Id.*)

Cook did not seek treatment again until December 2004. (Tr. 19-20, 137-199.) His case was not opened at MHMR in December 2004 "because the diagnosis of Intermittent Explosive Disorder did not meet priority population criteria." (Tr. 196.)

Cook sought mental health treatment at MHMR again on February 23, 2005, because he needed medication to help with his anger. (Tr. 19, 193-97.) He explained that he was a full-time student at Vernon College and had custody of his six-year-old son. (Tr. 196, 205-206.) Gloria Simmons, L.P.H.A. ("Ms. Simmons") observed that Cook was alert and oriented in all spheres. (Tr. 193.) She assessed that Cook's functional impairment was "2 LOW." (Tr. 193.) Ms. Simmons rated Cook's global assessment of functioning ("GAF") at 55, which indicates only moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 1994) ("DSM-IV-TR"). (Tr. 193, 196.) On the "Brief Bipolar Disorder Symptom Scale," Ms. Simmons rated Cook's "Hostility" at 5 (Moderately Severe) and his "Depression" at 4 (Moderate). (Tr. 195.)

On March 1, 2005, Cook reported to Art Glenn Smith, M.D. ("Dr. Smith") at MHMR that "the irritability gets severe." Dr. Smith administered a psychiatric evaluation. After noting Plaintiff's mental health history, Dr. Smith stated that Cook was experiencing constant irritability of at least moderate severity, with at least four days a week of severe irritability. Cook also described moderate depression which Cook attributed to his inability to find employment. On a mental status exam, Dr. Smith described Cook as alert and oriented with a "perhaps slightly coy" attitude and stated that he was "somewhat psychomotor slowed." His affect was "mostly constricted, but he smiled and laughed lightly several times. His underlying mood was "moderate

3

to severe irritability and mild to moderate depression," with other findings being unremarkable. Dr. Smith diagnosed "Bi-Polar Disorder-Mixed, Moderate" and assigned current and past-year-maximum GAF ratings of 40.[2] Dr. Smith prescribed Depakote ER 500 mg. (Tr. 183, 189, 191-92.)

In April 2005, Cook underwent a laparoscopy gall bladder surgery at Willbarger General Hospital. Dr. Reynaldo Tolentino's preoperative assessment of Cook noted that Cook had been taking Depakote, but he had quit taking it one week before. (Tr. 156.)

Jack R. Tomlinson, M.D. ("Dr. Tomlinson"), a consultative psychiatrist for the Commissioner, examined Cook on August 19, 2005. (Tr. 159-63.) Cook told Dr. Tomlinson that he has had "trouble with anger his entire life" and an "attitude problem" since childhood. (Tr. 159.) Cook stated that he "currently takes Depakote ER," 500 mg daily. (Tr. 160-61.) Dr. Tomlinson indicated that Plaintiff's employment history revealed that he had been fired by at least six employers (three times by one of them) since 1999 or 2000. The firings were due to conflicts with co-workers and/or supervisors. Cook related that he did not belong to any organizations, attend church, or visit with friends. Cook stated that he has trouble with sleep, recent and remote memory, and concentration. On mental status examination, the findings were unremarkable except that Cook did not know the difference between a mistake and a lie, nor the difference between a river and a canal. Dr. Tomlinson's diagnostic impression was "Bipolar I Disorder, Mixed, Without Psychosis"

---

[2] A GAF of 31 to 40 indicates "**[s]ome impairment in reality testing or communication** (e.g., speech is at times illogical, obscure, or irrelevant) **OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood** (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV-TR at 34.

4

and he assigned current and past-year-maximum GAF ratings of 70.[3] He stated that "the claimant seems to be doing fairly well, but he will probably need to continue his treatment with MHMR." (Tr. 163.)

### The Hearing

The hearing before the ALJ convened on March 8, 2007. (Tr. 200-37.) Cook was represented by Roger Owen, who is not an attorney. (Tr. 202.) At the hearing, Cook and the VE testified. (Tr. 204-236.) Cook's girlfriend was also present at the hearing, but did not testify. (Tr. 203, 227.)

### Plaintiff's Testimony

Cook testified that he went to college for two semesters to study criminal justice but had to quit because of his divorce and custody proceedings. (Tr. 205-06.) He has an eight-year-old son. (Tr. 206.) His son's mother died in a car accident. (Tr. 207.) Cook testified that he is six feet two inches tall and weighs 480 pounds. (Tr. 208.) Cook stated that he tried to serve in the army but that his application was denied because of his bipolar disorder and his weight. (Tr. 209.) His last job was a seasonal job drying peanuts at Vernon Peanut Company, but it only lasted a month because he did not get along with the other workers. (Tr. 210.) Cook reported he has been arrested twice, most recently in Lubbock for domestic assault. (Tr. 210-11.) He received deferred adjudication and completed probation and court-ordered anger management classes. (*Id.*) This was where he first was diagnosed with bipolar disorder. (Tr. 212.) Cook did not believe the classes helped and did not

---

[3] A GAF of 61-70 indicates "**[s]ome mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships**." DSM-IV-TR at 34.

agree with his diagnosis. (*Id*.) He obtained custody of his son when his wife failed to appear in court. (Tr. 213.) Cook denied any alcohol or drug use. (Tr. 214.)

Cook's girlfriend takes his son to school and goes to work at 2:30 in the afternoon. (Tr. 214-15.) Cook does not normally wake up until 9:30 or 10:00 a.m. and related that he spends the day staring at the walls to keep himself out of trouble. (Tr. 214.) He can take care of his hygiene and dress himself. (Tr. 215.) Cook has a driver's license and picks his son up from school. (Tr. 217.) He is able to help with household chores and has no physical limitations. (*Id*.) He claims that potentially, he could walk a mile if he got into shape. (Tr. 218.) Cook testified that he is supposed to take medication, but he doesn't take it. (Tr. 215.) He used to go to therapy twice a week but stopped after his SSI was denied. (Tr. 219.) Cook believes that if Social Security doesn't think he has a disability, he is not going to take medication and therapy because apparently, he doesn't need them. Cook has looked for a job but keeps getting rejected. (Tr. 220.) He is not involved in church or community activities. (*Id*.)

When questioned by his representative, Cook testified that he was fired from a Wal-Mart after a month and a half for shoving a coworker's head into a basket of oranges. (Tr. 222.) He was also fired from Kentucky Fried Chicken three times. (Tr. 223.) He was fired the first time for not doing his job, a second time for punching a supervisor, and a third time for failing to appear for a meeting. (Tr. 224.) Cook also worked at North Texas State Hospital as an aide, but he was fired for making an angry gesture toward a nurse. (*Id*.) When he worked at United Supermarkets, Cook was fired for threatening an employee, slashing the employee's tires, breaking his car windows, and punching him in the head. (Tr. 225.) At one job, when a coworker began throwing hot dogs at Cook, Cook shoved five hot dogs down the coworker's throat. (*Id*.) Cook was fired for

6

insubordination at Vernon Nursing Home. (*Id*.) When the administrator threatened to call the police, Cook threw over the administrator's desk. (*Id*.) Cook estimates that he has had twenty-two or twenty-three jobs since high school. (Tr. 226.) Cook states that his family saw a change in his temperament when he took his medication but that he stopped taking it when he was denied SSI. (*Id*.) He says that he has broken doors and windows when he was angry, but afterwards, he did not remember his actions. (*Id*.) Cook is also diagnosed with irritable and intermittent explosive disorder and high blood pressure, but does not take medication. (Tr. 227.) Cook claims that he is a problem solver and could hypothetically complete a job on paper. (Tr. 228.)

### **Vocational Expert's Testimony**

According to the VE, Cook's past work as a stock clerk is classified as heavy, semi-skilled work with a specific vocational preparation ("SVP") of four. (Tr. 232.) Cook also worked as a landscape laborer classified as heavy, unskilled work. (*Id*.) The VE also classifies Cook's job as a fast food worker as light, unskilled work. (*Id*.) Cook's employment as a dietary aide is medium, unskilled work. (*Id*.) The work of a cook is medium, skilled with an SVP of five. (*Id*.) The VE also classifies Cook's work as a mental retardation aide as medium, skilled work with an SVP of six. (*Id*.) Cook's work as a caregiver classifies as medium, semi-skilled with an SVP three level because of the short duration of the job. (Tr. 233.) Cook and his representative agree with the VE's description of Cook's employment history. (*Id*.) The ALJ then posed the following hypothetical question to the VE:

> So, assume we have a hypothetical individual same age, education and work experience as that of the claimant, but has the following exertional and non-exertional limitations, which I will give you at this time. This hypothetical individual can occasionally lift and carry objects no more than 100 pounds, frequently lift or carry objects up to 50 pounds, walk and/or stand with normal breaks six hours in an eight hour work day and sit with normal break for a total of six hours in an eight hour

7

work day. He has the ability to understand, remember and carry out simple and some detailed instructions. He can interact appropriately with others at a superficial level. Can adapt to a work situation; however, should avoid direct contact with the general public. Additional non-exertional limitations as to the evidence of record and today's testimony. Restrictions as to his daily living activities that would be mild. Difficulties in maintaining social functioning that would be moderate. Deficiencies in concentration, persistence and pace that would be rated as mild. Based on these exertional and non-exertional limitations, can this hypothetical individual perform any of his past relevant work as he previously performed it or how it's generally performed in the regional or national economy, please?

(Tr. 233-34.) The VE responded that such a person could hold the appropriate occupation of a landscape laborer or the available occupation of a stock clerk. (Tr. 234.) The VE testified that there may be "some reduction in the number of the jobs because of the restriction regarding some detailed work." (*Id.*) There are an estimated 99,000 jobs as a stock clerk in Texas and 1,600,000 in the nation. (Tr. 235.) The reduction would include about fifty percent of those jobs due to more detailed work. (*Id.*) The VE then gave examples of unskilled occupations. (Tr. 235-36.) She gave the example of a machine feeder at the medium, unskilled level with an estimated 4,500 jobs in Texas and 146,000 nationally. (Tr. 235.) The VE gave an example of light, unskilled level work. (*Id.*) She then testified that there are approximately 41,000 regional jobs as a bottling line attendant and 840,000 in the national economy. (Tr. 236.) The VE also gave an example of sedentary, unskilled work as a polisher. (*Id.*) There are approximately 7,000 such jobs in the Texas economy and 102,000 in the United States. (*Id.*) On cross-examination, the VE stated that while the hypothetical individual could obtain a job, the individual could not keep a job due to explosive behavior. (*Id.*) She clarified that this would be true "across all exertional levels." (*Id.*)

### **The ALJ's Decision**

The ALJ found that Cook was not disabled, as defined in the Social Security Act, from June 6, 2005. While considering the short duration of Plaintiff's job at Vernon Peanut Company, the ALJ

8

found that Cook had not engaged in substantial gainful activity since June 6, 2005. (Tr. 16; Finding 2.) The ALJ determined that Cook was severely impaired with Bipolar I Disorder and Intermittent Explosive Disorder to the extent of limitation in Plaintiff's ability "to perform basic work activities." (Tr. 16; Finding 3.) The ALJ also noted noncompliance with medication. (Tr. 20; Finding 5.) The ALJ evaluated Plaintiff's impairments under affective disorders and personality disorders. (Tr. 17; Finding 4.) However, these impairments did not meet or medically equal the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (*Id*.) To satisfy limitation criteria, a claimant must have "two marked or one extreme functional limitations." (*Id*.) After evaluation, Cook's impairments did not meet the degree of limitation for "B" or "C" criteria. (*Id*.) The ALJ determined that Cook's ability to perform work was impeded "by additional nonexertional limitations in that he can understand, remember and carry out simple and some detailed instructions." (Tr. 17; Finding 5.) The ALJ reasoned that Cook could interact with others at a superficial level and adapt to work situations but should avoid direct contact. (*Id*.) The ALJ did not feel that the complaints prevented the performance of work at the identified level. (Tr. 20; Finding 6.) The ALJ determined that "the claimant is capable of making a successful adjustment to other work." (Tr. 22; Finding 10.) Under the requirements of unskilled representative occupations at all exertion levels, the ALJ, relying on the VE's testimony, found that Cook was able to perform a significant number of jobs that exist in the national economy, including a machine feeder, bottle line attendant, or polisher. (Tr. 21-22; Finding 10.)

## **Standard of Review**

To be entitled to social security benefits, a plaintiff must prove that he is disabled for purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995);

9

*Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work the individual has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove his disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of

performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). An individual must demonstrate the onset of disability on or before his DLI in order to qualify for DIB. Thus, a claimant who becomes disabled after the expiration of his insured status is not entitled to benefits under Title II of the Social Security Act. *Oldham v. Schweiker*, 660 F.2d 1078, 1080 (5th Cir. 1981); 42 U.S.C. §§ 416(i)(3), 423c. A claimant bears the burden of establishing a disabling condition before the expiration of insured status. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992); *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236; 42 U.S.C. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

## **Issue**

Cook contends that the ALJ's determination of Cook's mental residual functional capacity ("MRFC") is not supported by substantial evidence and results from prejudicial legal error. The Commissioner responds that substantial evidence and relevant legal precedent support the ALJ's

determination of Cooks' MRFC.

## Analysis

### State Agency Medical Consultants' ("SAMC") Reports and Cook's MFRC

RFC refers to the claimant's ability to do "sustained work-related physical and mental activities in a work setting on a regular or continuing basis," eight hours a day, for five days a week or an equivalent work schedule, despite any physical or mental impairments. SSR 96-8p; 20 C.F.R. § 404.1545(a). The ALJ has the responsibility to determine the claimant's RFC at the administrative hearing based on all of the evidence, including the medical records, observations of treating physicians and other acceptable medical sources, and the claimant's own description of his limitations. *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995). The ALJ must resolve conflicts in the evidence and make credibility determinations based on substantial evidence. *Lovelace v. Bowen*, 813 F.2d 55, 59-60 (5th Cir. 1987); *Allen v. Schweiker*, 642 F.2d 799, 801 (5th Cir. 1981) (per curiam). "The [proper] inquiry [] is whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

On September 6, 2005, Hanna Henry ("Ms. Henry"), a SAMC, stated her opinion that Cook had "moderate"difficulties in maintaining social functioning, and that his problems with anger and irritability are well documented. She would restrict him to jobs which require limited contact with others. (Tr. 175, 177.) She also stated specifically that Cook was "moderately limited" in the abilities to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) work in coordination with or proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and

to perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticism from supervisors; and, (7) get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 179-180.) Ms. Henry concluded in a narrative statement that "[c]laimant is able to understand, remember and carry out detailed but not complex instructions, make basic decisions, concentrate for extended periods, interact with others and respond to changes." (Tr. 181.) On December 27, 2005, Ms. Henry's opinions were affirmed by Leela Reddy, another SAMC. (Tr. 199.) The ALJ gave "great weight" to the opinions of the SAMCs as well supported by medically accepted clinical and laboratory findings and as consistent with the record as a whole. (Tr. 20.) The ALJ decided that Cook had the MRFC to understand, remember, and carry out simple, and some detailed, instructions. (Tr. 17, Finding 5.) He further found that Cook could adapt to a work situation and interact appropriately with others at a superficial level, but he should avoid direct contact with the general public. (*Id.*)

Cook argues that the ALJ committed prejudicial error by giving "great weight" to the SAMCs' narrative conclusion, but failing to mention, discuss, evaluate, or assign weight to the SAMCs' findings that Cook was moderately limited in his ability to complete a normal workday and to perform at a consistent pace (Tr. 20, 280). (Pl.'s Br. at 9-14.) Cook contends that the ALJ picked and chose only those parts of the SAMCs' findings that were favorable to a determination of "not disabled." The Commissioner counters that the ALJ is not required to adopt the entire report of the state agency experts verbatim but has the authority to interpret and weigh the SAMCs' reports. (Resp. Br. at 11.) Additionally, the Commissioner argues that the ALJ is not required to specifically explain each piece of evidence that he accepts or rejects. (*Id.*)

13

Social Security Ruling 96-6p states that "the administrative law judge . . . must consider and evaluate any assessment of the individual's RFC by a State agency medical or psychological consultant and by other program physicians or psychologists." Soc. Sec. Rul. 96-6p. Furthermore, ALJs "may not ignore these opinions and must explain the weight given to the opinions in their decisions." *Id*. The ALJ explained that he gave great weight to the SAMCs' opinions and found that they were well supported medically and clinically as well as consistent with the record when viewed in its entirety. The Court finds that the ALJ did not fail to follow the regulations with respect to the state agency medical opinions or err in his assessment of Cook's MRFC. The ALJ was entitled to consider the consistency of the SAMCs' findings with the medical and clinical evidence and to consider the record in its entirety when assessing Cook's MRFC. "Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected… The major policy underlying the harmless error rule is to preserve judgments and avoid waste of time" *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). Even if the ALJ failed to specifically mention the SAMCs' findings that Cook was moderately limited in his ability to complete a normal workday and to perform at a consistent pace, the record as a whole does not show that the ALJ failed to consider these findings or that Cook was prejudiced. The ALJ's MRFC finding reflects the limitations expressed by all of the physicians, and the record as a whole supports the ALJ's decision. Accordingly, the ALJ's failure to specifically mention certain of the SAMCs' findings is harmless and does not warrant a remand.

Further, the ALJ did not commit error by not specifically indicating at step five of the sequential evaluation process that Cook would be able to sustain any work he would obtain. This is not a case where the claimant experienced occasional symptom-free periods and a sporadic ability

14

to hold a job, which were symptomatic of his mental disability. *See Leidler v. Sullivan*, 885 F.2d 291, 292 n.3 (5th Cir. 1989) (citing *Poulin v. Bowen*, 817 F.2d 865, 875-76 (D.C. Cir. 1987)).

To receive benefits, a claimant must follow treatment prescribed by his physician if the treatment can restore the ability to work. 20 C.F.R. § 404.1530(a). If the claimant does not follow prescribed treatment without good reason, he will not be found disabled. § 404.1530(b). When an ALJ determines whether the claimant has an acceptable reason for failing to follow the prescribed treatment, the ALJ must consider the claimant's limitations, including mental limitations. 20 C.F.R. § 404.1530(c). Courts have found that non-compliance that is the result of a mental impairment rather than the claimant's rational choice or neglect may be a justifiable excuse, and that each case depends upon its individual facts, rather than a *per se* rule. *See Lovelace v. Bowen*, 813 F.2d 55, 59-60 (5th Cir. 1987); *Scott v. Heckler*, 770 F.2d 482, 486-87 (5th Cir. 1985); *Brashears v. Apfel*, 73 F. Supp. 648, 651 (W.D. La. 1999).

The ALJ found that:

> claimant's subjective complaints are not substantiated by the objective findings or the overall weight of the evidence to be of such intensity, frequency, and duration as to prevent the performance of work activity at the level identified herein. The claimant's problems with anger and irritability are well-documented. He has a history of noncomplaince with his medical treatment. However, per the claimant's consultative examination, the symptoms appear to have diminished due to his current round of pharmaceutical treatment. At the hearing, the undersigned noted the claimant appears to be a bright individual and has a nice personality. He has been given the advantage of anger management classes. He has had other opportunities for treatment through Helen Farabee, which he quit on his own. He has an anger problem which he can control but will not. To the extent that the claimant's testimony tends to show otherwise, such testimony, in light of all the evidence, including the medical exhibits, is deemed not sufficiently credible to support a finding of "disability" under the current criteria.

(Tr. 20.) The record supports the ALJ's findings that Cook has a history of noncompliance with medical treatment but that his symptoms appear to diminish when he is compliant with medication

15

and counseling. Moreover, the record does not show that Cook was non-compliant with his prescribed medications due to his mental impairments. In an examination on March 1, 2005, Dr. Smith stated that "Plaintiff does have insight into his psychiatric symptoms . . . [and] his [b]asic underlying judgment is intact." The non-examining state agency medical source, Dr. Tomlinson, found Cook to be "an alert male who appeared to be in no acute distress," and assessed Cook's GAF at 70, currently and for the past year, indicating "some difficulty in social, occupational or school functioning," but "generally operating pretty well (Tr. 163)." *See* DSM-IV-TR at 34. The consulting physician noted that Cook "will probably need to continue his treatment with MHMR." Cook's noncompliance was not due to poverty. Cook was able to obtain psychiatric care and medications at MHMR. Cook admitted that he "was supposed to take medication" but did not. (Tr. 215.) He stated, "I refused to take my medications." (*Id.*) In sum, the record supports the ALJ's finding that Cook "has had other opportunities for treatment through Helen Farabee, which he quit on his own. He has an anger problem which he can control but will not." There is nothing in the record to show that if Cook were compliant with his medication and treatment he would experience symptom-free periods and a sporadic ability to hold a job, which were symptomatic of his mental disability. Therefore, the ALJ did not err by failing to make a separate determination about Cook's ability to hold a job if he obtained one. Cook's point of error is overruled.

## Conclusion

Cook failed to prove that the ALJ applied any incorrect legal standards. Additionally, Cook failed to show that substantial evidence does not support the ALJ's finding that Cook is not disabled

within the meaning of the Social Security Act. The Commissioner's decision is **AFFIRMED.**

IT IS SO ORDERED this 2nd day of October, 2008.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE